## AFFIDAVIT OF BORDER PATROL AGENT BRANDON HALL

Your affiant, Brandon Kyle Hall, a Border Patrol Agent of the United States Border Patrol, being duly sworn, does depose and state the following:

## INTRODUCTION AND AGENT BACKGROUND

1. I have been employed by the United States Border Patrol (USBP) since September 24, 2018. I am permanently assigned to the Tucson Station within Tucson Sector but am currently assigned to the Tucson Sector Prosecutions Unit. I completed the USBP academy on March 19, 2019. At the academy I received instruction on constitutional law, immigration law, and federal and civil statutes. I have also received instruction in the detection, interdiction, and arrest of aliens illegally present in the United States, alien smugglers, and narcotics smugglers.

2. On June 19, 2022, I began my detail at Tucson Sector Prosecution Unit as a case agent. Since being assigned to the prosecutions unit I have reviewed several alien smuggling, illegal entry, drug, assault, and prohibited possession cases. I have also testified in Federal court and worked as a liaison between USBP and the United States Attorney's Office. While assigned to the Tucson Station I was involved in several different cases involving but not limited to, alien smuggling, illegal entry, drug, assault, and prohibited possession cases. During my time in the field I investigated illicit activities, gathered and processed evidence, and generated reports. Both while assigned to the Tucson Station and the prosecution's unit I have routinely preformed records checks through various law enforcement databases to gather accurate information and facts. I have assisted fellow agents in the development of their cases. I have taken sworn statements from material witnesses and suspects. I routinely perform record checks through various law enforcement databases to establish accuracy of information as well as gather facts relevant to cases.

Page | 1

3. Through my training and experience as a Border Patrol agent and a Prosecutions case agent, I have learned the most common and preferred method of Alien Smuggling Organizations (ASO) communication is through the utilization of cellular phones to communicate between coordinators, scouts, foot guides (guides), vehicle load drivers, stash house operators and caretakers, etc. When examining cellular phones, you can uncover, among other things: evidence that reveals or suggests who possessed or used the device, evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated; and apps such as Google Maps which will contain directions for the load vehicle. ASOs will utilize several different apps and functions on their phones to facilitate the coordination of a smuggling event, all the way from inception of the alien's illegal entry to delivery of the alien at the desired location in the United States. In addition, the apps that ASOs use may vary from cellular phone to cellular phone.

4. The statements contained in this affidavit are based on information provided by fellow Border Patrol Agents and based on my experience as a Border Patrol Agent. Since this affidavit is submitted for the limited purpose of securing a search warrant, I have not included all facts known to me regarding this investigation. I have set forth facts that establish probable cause to believe that the defendant referred to in this investigation conspired with others known and unknown, wherein they jointly facilitated, either verbally or electronically, the movement of illegal aliens into and within the United States. This affidavit is intended to show only that there exists sufficient probable cause for the requested warrant and does not portray all of my knowledge about this matter.

5. I submit this affidavit in support of an Application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the contents of electronic communication devices capable of accessing the internet, defined below as **Target Devices 1, (TD-1)**, and the extraction from **TD-1** of electronically stored information further described in Attachment B.

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6. The property to be searched consists of one cellular phone. The cellular phone to be examined is a black TCL Smartphone in evidence bag A6291367 (**TD-1**), belonging to Jaquaviese Marquise JOHNSON, (hereinafter, **TD-1**). Ownership for **TD-1** has been established and is documented on CBP Form 4609, Petition for Remission or Mitigation of Forfeitures and Penalties Incurred, which JOHNSON submitted with his signature affixed to it identifying his property. **TD-1** is currently stored at the Brian A. Terry Border Patrol Station's evidence safe, maintained by the Brian A. Terry Border Patrol Station Seized Property Specialist (SPS). **TD-1** is to be searched pursuant to the attached Application are further described in Attachment A.

7. The requested warrant would authorize the forensic examination of **TD-1** for the purpose of identifying electronically stored data as described in Attachment B.

## **PROBABLE CAUSE**

8. On September 28, 2022, in the District of Arizona (Hereford), at approximately 6:49 p.m., Border Patrol Agents (BPAs) were advised of a white Chevrolet sedan traveling southbound on State Route (SR) 90 near Huachuca City, Arizona that had alerts for being associated with non-citizen and currency/weapons smuggling. At approximately 7:15 p.m., a Mobile Surveillance Capability (MSC) camera operator observed four subjects walking north in the brush near the intersection of South Apache Sky Road and East Clinton Lane. At approximately 7:28 p.m., BPAs observed a white Chevrolet Malibu traveling southbound on Hutchinson towards the area where the four subjects were observed. An Office of Air and Marine (OAM) helicopter responded to the area and kept visual of the vehicle from a distance. The OAM helicopter pilot observed the vehicle stop at the intersection of South Samuel Road and Clinton Lane, flash its headlights, and wait. The vehicle was then observed leaving the area and traveling northbound on Hutchinson. Shortly after, BPAs obtained visual of the vehicle and initiated a vehicle stop for an immigration inspection on the vehicle's occupants. The vehicle came to a slow stop and the front and rear passenger doors opened and four subjects began running from the vehicle. With the help of the OAM helicopter, BPAs were able to apprehend all four subjects that absconded from the vehicle. BPAs approached the vehicle and made contact with the driver, identified as Jaquaviese Marquise JOHNSON, and took him into custody. An immigration inspection was conducted on the four subjects that ran from the vehicle, to include Enrique VELAZCO-Garcia, Miguel SALAS-Onofre, Fausta DE LA CRUZ-Tapia, and Julio Cesar OLIVARRIA-Rosas, were all determined to be citizens of Mexico, illegally present in the United States.

9. JOHNSON was then placed under arrest for a suspected violation of 8 U.S.C. 1324. Border Patrol Agents seized JOHNSON'S cellphone as evidence in this smuggling case.

10. The material witnesses, VELAZCO-Garcia, SALAS-Onofre, DE LA CRUZ-Tapia and OLIVARRIA-Rosas admitted they arranged to be smuggled into the United States for a fee and that they had entered the United States illegally.

11. VELAZCO-Garcia stated after he crossed into the United States illegally, he joined another group that consisted of one woman and two men, and the group was soon picked up by a white four-door sedan. SALAS-Onofre stated he crossed into the United States illegally with three other people and a guide. The guide led them to a dirt road and was then told to get into a white four-door sedan before their guide left them. DE LA CRUZ-Tapia stated she crossed into the United States illegally with a group of four people. The group then used GPS maps on a cell phone to guide them themselves to a dirt road. She stated that her group had sent their location to their guides to coordinate their pickup. She stated they were subsequently picked up by a white four-door sedan. OLIVARRIA-Rosas stated he crossed into the United States illegally with three other people and a guide. Their guide led them to a dirt road to be picked up. At the road, OLIVARRIA-Rosas saw a white four-door sedan. He stated the driver was standing outside of the vehicle smoking what he thought was marijuana. He stated his group got into the car, but the guide left them. Each material witness was shown a photo line-up that included Jaquaviese Marquise JOHNSON and each material witness was able to positively identify him as the driver of the white four-door sedan.

//

//

12. Based on all these facts, I believe that **TD-1,** which was seized during the arrest of Jaquaviese Marquise JOHNSON, was used to communicate with members of an ASO prior to and during the smuggling venture to facilitate the crime of guiding and transporting illegal aliens for profit.

13. Since the date of the arrest, **TD-1** has been stored in the Brian A. Terry Border Patrol Station evidence vault, maintained by the Brian A. Terry SPS. **TD-1** has been stored in such a manner that its contents, to the best of my knowledge, are in substantially the same state as when it first came into possession of the USBP.

## TECHNICAL TERMS

14. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic address books, sending, receiving and storing text messages; in e-mail capabilities, taking, sending, receiving, and storing still photographs and moving

11

video; storing and playing back audio files; storing dates, appointments and other information on personal calendars; and accessing and downloading information from the internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Internet: The internet is a global network of interconnected computer networks that use Internet protocol suite (TCP/IP) to communicate between networks and devices. It is a *network of networks* that consists of private, public, academic, business, and government networks of local to global scope, linked by a broad array of electronic, wireless, and optical networking technologies. Due to this structure of the internet, connections between devices on the internet often cross state and international borders, even when the devices communicating with each other are in the same state. Most cell phones currently manufactured allow the use of the internet as a standard feature. Further, most current cell phones allow the user to transmit electronic messages via standard email services or specially designed communication applications between parties.

//

12

15. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text, email, other electronic messaging applications and voice mail communications between the person who possessed or used the device and others. Navigational coordinates may also be transmitted to and/or from these devices to determine the user's location through a GPS application.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

16. Based on my knowledge, training, and experience, I know that electronic devices such as **TD-1** in this case, can store information for long periods of time. Similarly, things that have been viewed via or uploaded to the Internet are typically stored for some period of time on the device. Additionally, computer files or remnants of such files can be recovered even if they have been deleted. This is because when a person "deletes" the information on an electronic device, the data does not actually disappear, rather, the data remains on the storage medium until it is overwritten by new data. Information described in this affidavit can often be recovered by forensic computer experts using forensic tools and software.

17. As further described in this affidavit and Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the

13

crimes described on the warrant, but also forensic evidence that establishes how **TD-1** was used, where it was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence will be on **TD-1,** as more fully set forth in the factual section contained herein and because:

    A.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file, including frequency channels, text messages, video, or photographs.

    B.    Forensic evidence on a device can also indicate who has used or controlled the devices. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    C.    A person with appropriate familiarity of how an electronic device works may, after examining the forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    D.    The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.

14

        Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

        E.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, when and where, sometimes it is necessary to establish that a particular thing is not present on a storage medium, for example, the absence of the entry of a name in a contact list as evidence that the user(s) of device did not have a relationship with the party.

18. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **TD-1** consistent with the warrant. The examination may require authorities to employ techniques, including, but not limited to, computer-assisted scans of the entire medium, that might expose many parts of **TD-1** to human inspection in order to determine whether it is evidence described by the warrant.

15

19. If **TD-1** is damaged beyond repair, password protected otherwise inoperable, less invasive data analysis techniques will not accomplish the forensic goals of the examination. If this is true, an analysis technique referred to as "chip off" may be implemented to conduct the data extraction process. Chip-off is an advanced digital data extraction and analysis technique that would involve physically removing flash memory chip(s) from **TD-1** and then acquiring the raw data using specialized equipment. This process would render **TD-1** unusable. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

20. Based on the foregoing information, there is probable cause to believe that **TD-1** contains evidence related to violations of 8 U.S.C. § 1324.  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **TD-1** described in Attachment A to seek the items described in Attachment B.

*Brandon Kyle Hall*
Brandon Kyle Hall, Border Patrol Agent
United States Border Patrol

Subscribed and sworn to before me this __31st__ day of March, 2023:

_____
Honorable Bruce G. Macdonald
United States Magistrate Judge
District of Arizona

16

## ATTACHMENT A

## ITEMS TO BE SEARCHED

The cellular phone to be examined is a black TCL Smartphone in evidence bag A6291367 (**TD-1**), belonging to Jaquaviese Marquise JOHNSON, (hereinafter, **TD-1**). The target device is currently stored at the Brian A. Border Patrol station's evidence safe, maintained by the Brain A. Terry Border Patrol station SPS.

# ATTACHMENT B

# DESCRIPTION OF ITEMS TO BE SEARCHED FOR

The particular things to be seized include all records, in whatever format, stored on the **TD-1** that are related to violations of 8 U.S.C. § 1324, including:

1. Digital, cellular, direct connect, and/or other phone numbers, names, addresses, and other identifying information of associates of the user of the **TD-1**;

2. Digital, cellular, direct connect, and/or other phone numbers dialed from, which contacted, or which are otherwise stored on, the **TD-1**, along with the date and time each such communication occurred;

3. Information related to incoming calls, outgoing calls, missed calls, and duration of calls stored on or accessed through the **TD-1**;

4. Contact lists stored on or accessed through the **TD-1**, to include telephone and email contact names, telephone numbers, addresses, and email addresses;

5. Electronic correspondence stored or accessed through **TD-1,** whether sent from, to, or drafted on, the **TD-1**, along with the date and time each such communication occurred, including emails and attached files, text messages, and instant messaging applications;

//

6. The content of voice mail messages stored on the **TD-1**, along with the date and time each such communication occurred, including voice mail messages sent by texting or instant message applications;

7. Photographs or video recordings:

8. Information relating to the schedule, whereabouts, location, or travel of the user of the **TD-1**;

9. Information relating to other methods of communications utilized by the user of the **TD-1,** and stored on the **TD-1**;

10. Evidence of user attribution showing who used or owned the **TD-1,** such as logs, phonebooks, saved usernames and passwords, documents, and internet browsing history.

As used above, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.